**In re PETITION FOR RULE OF COURT GOVERNING LAWYER ADVERTISING.**

Supreme Court of Tennessee.

April 10, 1978.

J. D. Lee, pro se.

Thomas H. Peebles, III, Gareth S. Aden, Thomas C. Binkley, David B. Herbert, Nashville, for Nashville Bar Assn.

Robert L. McMurray, Bell, Painter, McMurray, Callaway, Brown & Mashburn, Cleveland, Joe V. Gaston, Chattanooga, for Tennessee Bar Assn.

Sidney W. Gilreath, Knoxville, for Tennessee Trial Lawyers Assn.

Larry D. Woods, Woods & Woods, Nashville, amicus curiae for Tennessee Ass'n of Broadcasters; Tennessee Valley Broadcasting Corp.; Mooney Broadcasting Corp.

## OPINION

HENRY, Chief Justice.

In the wake of *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), we have been presented with various petitions asking that we amend our Code of Professional Responsibility so as to permit lawyer advertising.

J. D. Lee, Esquire, a practicing attorney in Madisonville, asserting that this Court "alone is vested with the supervisory and disciplinary powers over attorneys practicing in the State of Tennessee," urges (1) that we amend Disciplinary Rule 2–102 so as to permit lawyer advertising, and (2) that we adopt a plan for the certification of specialists. It is further Mr. Lee's position that lawyers should be permitted to advertise by means of "television, radio, motion picture, newspaper, magazine or book." Mr. Lee has appended a proposed plan for the consideration of the Court.

The Tennessee Bar Association petitions the Court to adopt a revised Disciplinary Rule 2 (DR 2) of the Code of Professional Responsibility, which differs essentially from Proposal A (see infra, Sec. V) of the American Bar Association only in that the TBA would permit no electronic advertising and no designation as a specialist until this Court "specifically authorizes such designation and determines the conditions under which such designation could be made." The TBA proposal would permit lawyers to advertise in the areas in which they practice or to state that they limit their practice to certain areas, as soon as this Court adopts a program of specialization.

The Nashville Bar Association submits that this Court should modify the present Code of Professional Responsibility "to the extent clearly and absolutely mandated" by *Bates, supra*. The NBA strongly insists that we define "routine legal services," as that phraseology is used in *Bates*; that we determine the matter of electronic advertising; that we adopt clear rules governing the advertising of legal specialties and the certifying procedure; and that we determine guidelines for advertising "background" information. By supplemental petition the NBA, with reservations, adopts the position of the TBA, and urges the Court "to promulgate strong and vigilant enforcement procedures in reference to advertising by attorneys."

Thus we have before us four proposals, i. e., the Lee Plan, the NBA Plan, the TBA Plan and the Proposal of the American Bar Association.

The Tennessee Trial Lawyers Association advocates restricting advertising to the print media and, without adopting any specific plan, has recommended twenty-three categories of permissible information.

The Tennessee Association of Broadcasters, the Tennessee Valley Broadcasting Cor-

poration, and Mooney Broadcasting Corporation have intervened, insisting that public policy demands that permissible attorney advertising include the electronic media.

## I.

### Historical Background

The Canons of Professional Ethics were adopted by the American Bar Association in 1908.

We know of no better approach to the derivation and continuation of the rules relating to advertising than to turn to the recognized and authoritative treatise, *Legal Ethics*,[1] authored by Henry S. Drinker of the Philadelphia Bar, the long-time Chairman of the Standing Committee on Professional Ethics and Grievances of the American Bar Association.

Mr. Drinker starts his treatment of advertising and solicitation thusly:

> The young men who, in the early days of the bar, came to the Inns of Court to study and eat the requisite dinners there in order to become barristers, were practically all the sons of well-to-do parents, who did not have to worry about earning their keep, and who traditionally looked down on all forms of trade and the competitive spirit characteristic thereof. They regarded the law in the same way they did a seat in Parliament—as primarily a form of public service in which the gaining of a livelihood was but an incident. The profession of the law hence acquired a certain traditional dignity which it has been the aim of the bar to preserve ever since.
>
> The conditions under which the barristers practiced their profession materially contributed to this attitude. They were a select fraternity who lived together and met one another every day, both at dinner and in court, on a friendly basis. Obviously this intimacy would have been impossible for men who were continually *blowing their professional horns and plotting to steal away one another's clients, and hence looked down on by their colleagues.* (Emphasis supplied). Legal Ethics, 210.

Lawyers trained at the Inns migrated to this country and in our early days substantial numbers of young men went to England to receive their legal training. The English concept thus became entrenched in America in our early years.

Drinker attributes the persistence of these rules and their inclusion in the Canons of Ethics to factors that may be summarized as follows (See Legal Ethics 211–212):

1. While the legal fraternity in America has never been as intimate as among the English barristers, "still they differ radically from the milk man, the liquor dealer, or the manufacturer of cigarettes in being yesterday an antagonist and today a colleague on the same side of the counsel table."

2. Lawyers are members of a profession.[2] This, according to Drinker, "is not a fancied conceit, but a cherished tradition, the preservation of which is essential to the lawyer's reverence for his calling."

3. "[A]dvertising, solicitation, and encroachment on the practice of others does not tend to benefit either the public or the lawyer in the same way as in the case of the sale of merchandise."

4. Advertising would "lower the whole tone of the administration of justice."

1. Published by Columbia University Press in 1953.

2. Drinker lists the primary characteristics which distinguish the legal profession from business pursuits as follows:
 1. A duty of public service, of which the emolument is a by-product. . . .
 2. A relation as an "officer of court" to the administration of justice. . . .
 3. A relation to clients in the highest degree fiduciary.
 4. A relation to colleagues at the bar characterized by candor, fairness, and unwillingness to resort to current business methods of advertising and encroachment on their practice, or dealing directly with their clients. See Legal Ethics, 5.

We are not prepared to reject these time-honored traditions. The law is an ancient, honorable and learned profession and its practitioners are not tradesmen in the marketplace. The role of the huckster, the hawkster, the haggler and the peddler ill becomes a member of a dignified profession.

## II.

### Origin & Development of Canons

Canon 27, of the Canons of Professional Ethics of the American Bar Association,[3] as originally adopted, read as follows:

The most worthy and effective advertisement possible, even for a young lawyer, and especially with his brother lawyers, is the establishment of a well-merited reputation for professional capacity and fidelity to trust. This cannot be forced, but must be the outcome of character and conduct. The publication or circulation of ordinary simple business cards, being a matter of personal taste or local custom, and sometimes of convenience, is not per se improper. But *solicitation of business by circulars or advertisements, or by personal communications, or interviews, not warranted by personal relations, is unprofessional.* It is equally unprofessional to procure business by indirection through touters of any kind, whether allied real estate firms or trust companies advertising to secure the drawing of deeds or wills or offering retainers in exchange for executorships or trusteeships to be influenced by the lawyer. Indirect advertisement for business by furnishing or inspiring newspaper comments concerning causes in which the lawyer has been or is engaged, or concerning the manner of their conduct, the magnitude of the interests involved, the importance of the lawyer's positions, and all other like self-laudation, defy the traditions and lower the tone of our high calling, and are intolerable. Legal Ethics, at 215–16.

This canon was amended in 1937 primarily to recognize the propriety of law lists. It was further amended in 1940, and after the amendment, the pertinent portion stated that "[i]t is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations."

On August 12, 1969, the American Bar Association promulgated the current Code of Professional Responsibility.[4] This Court adopted this Code, and specified amendments thereto, as Rule 38, which appears at page 88 in Volume 5A of the Official Code.

Ethical Consideration (EC) 2–9 now reads as follows:

The traditional ban against advertising by lawyers, which is subject to certain limited exceptions, is rooted in the public interest. Competitive advertising would encourage extravagant, artful, self-laudatory brashness in seeking business and thus could mislead the layman. Furthermore, it would inevitably produce unrealistic expectations in particular cases and bring about distrust of the law and lawyers. Thus, public confidence in our legal system would be impaired by such advertisements of professional services. The attorney-client relationship is personal and unique and should not be established as the result of pressures and deceptions. History has demonstrated that public confidence in the legal system is best preserved by strict, self-imposed controls over, rather than by unlimited, advertising.

Disciplinary Rule 2–101(B) provides in part:

---

3. Adopted by the American Bar Association at its 31st Annual Meeting in Seattle, Washington, on August 27, 1908.

4. This Code was drafted by a highly prestigious 12-member Special Committee on Evaluation of Ethical Standards. Among its members were former Associate Justice Charles E. Whittaker; Walter P. Armstrong, Jr. (served as chairman during part of the life of the committee), of Memphis; E. Smythe Gambrell, former president of the ABA; Sylvester C. Smith, Jr., also a former president; A. James Casner of Harvard Law School; and Edward L. Wright of Little Rock, who later became ABA President.

A lawyer shall not publicize himself, or his partner, or associate, or any other lawyer affiliated with him or his firm, as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in city or telephone directories, or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf.

## III.

### The Supremacy Clause

The "Supremacy Clause" of the federal constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. Art. VI, cl. 2.

 It is fundamental to the law that where this Court's interpretation or application of a provision of our state constitution conflicts with the Supreme Court's interpretation of an analogous provision of the federal constitution, the state constitution[5] must yield under the Supremacy Clause. See *Roy v. Brittain*, 201 Tenn. 140, 297 S.W.2d 72 (1956).

Hence we bow to the opinion of the Supreme Court of the United States in *Bates v. State Bar of Arizona, supra*, wherein that Court held by a vote of five to four, (to the extent of the First Amendment issue), that the prohibition against advertising by lawyers, violates the First Amendment to the Constitution of the United States.

5. Article I, Section 19 of the Constitution of Tennessee provides that "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

## IV.

### An Analysis of Bates

We analyze the holding of *Bates* without comment as to its rationale or criticism of the results reached. We deal with a *fait accompli* and it would serve no useful purpose for us to join issue. Our task is to interpret the mandate of *Bates* and to translate it into a reasonable rule that is consistent with its holding.

Specifically pretermitting the issues of the "peculiar problems associated with advertising claims relating to the *quality* of legal services" and the "problems associated with in-person solicitation of clients," the Court made it clear that "[t]he heart of the dispute . . . is whether lawyers may constitutionally advertise the *prices* at which certain *routine* services will be performed." (Emphasis supplied.) 97 S.Ct. at 2700, 2701.

The opinion proceeds upon the assumption that "[t]he only services that lend themselves to advertising are the *routine* ones: the uncontested divorce, the simple adoption, the uncontested personal bankruptcy, the change of name, and the like." (Emphasis supplied). *Id.,* at 2703.

The Court specifically noted the difficulties of enforcement and observed that "the vigilance of a regulatory agency will be required" and that the "overseeing of advertising will be burdensome." *Id.,* at 2706–2707. The Court specifically recognized that regulation was proper and that "reasonable restrictions on the time, place, and manner of advertising" may be imposed, and false, deceptive or misleading advertising may be prohibited. Id., at 2709.

The Court further recognized that "the problems" of advertising on the electronic broadcast media will warrant special consideration.

Nothing in this opinion shall be construed as holding that the cited portions of the canons prohibiting lawyer advertising are offensive to this article of the Constitution of Tennessee. We expressly do not so hold.

These are the governing principles to which we must adhere as we attempt to fashion rules that will comply with *Bates*.

## V.

### *ABA Advertising Task Force*

On June 27, 1977, the date of the release of *Bates*, Justin Stanley, the then President of the American Bar Association, appointed a task force chaired by S. Shepherd Tate, the then President-Elect nominee, and now President-Elect of the Association. This task force was charged with the responsibility of "develop[ing] rapidly a set of recommendations on what the bar must do to respond affirmatively" to the *Bates* decision.

The ABA Task Force prepared alternative proposals, generally known as Proposal A, which adopted a "regulatory" perspective, and Proposal B, sometimes described as "directive." Proposal A was approved by the House of Delegates, the policy making body of the ABA, on August 10, 1977. It is this proposal that we accept as a point of departure.

## VI.

### *Variations from Proposal A*

After hearing oral argument and debating the merits of various portions of Proposal A, we have concluded that certain modifications should be made. Further, we are aware of a need for clarification in some areas. We now proceed to discuss these modifications and to attempt these clarifications.

### A. *The use of the electronic media*

The rule we announce today permits advertising by use of electronic broadcast media.

First we approach this issue from a standpoint of fundamental fairness to the electronic media.

It has been suggested that "if permitted to do so, lawyers might eventually advertise to the tune of $250 million dollars annually." [6] This figure may or may not be realistic, but we are persuaded that lawyer advertising will generate substantial revenue accruing to the benefit of the media. We can think of no reason for discriminating against the electronic media.

■■■ We are not unmindful of the *Bates* phraseology that "the special problems of advertising on the electronic broadcast media will warrant special consideration." We are not in agreement. The Supreme Court has held that lawyer advertising is a form of commercial speech protected by the First Amendment. This protection would be fragile indeed if it were only applied to certain media and not to others. Advertising is advertising irrespective of the device or instrumentality employed. Restricting lawyer advertising to the print media would frustrate the only legitimate benefit flowing from advertising, i. e., the provision of legal services to the public based upon the knowledgeable selection of a lawyer.

It was represented to the Tate Task Force that there were 40 million functionally illiterate American citizens.[7] Other sources suggest that there are conservatively 20 million American adults who are functionally illiterate.[8] It has been estimated that there are 1.4 million Americans who can neither read nor write.[9]

It is evident that a large segment of our society cannot profit from print media publication and must rely upon the electronic broadcast media. Again, if the public interest is to be served by lawyer advertising,

6. Wilson, *Madison Avenue, Meet the Bar*, 61 A.B.A.J. 586, 588 (1975).

7. Chamberlain, *Lawyer Advertising, Subject of Concern*, NLADA Washington Memo 4 (Sept. 1977); Report to the Board of Governors, by Task Force, 46 U.S.L.W. 1, 2 (August 23, 1977).

8. E. Smith, *Literary Education for Adolescents and Adults* (1970); Adult Functional Competency: A Summary, Texas Univ., Austin, Div. of Extension (Mar. 1975, ERIC Doc. 114 609).

9. "Why 1.4 Million Americans Can't Read or Write," U.S. News and World Report (August 14, 1974).

illiterates and functional illiterates, along with the non-sighted, must have a means of access to that advertising.

We expect the electronic media, through their own codes, to solve any "special problems" that may arise and we will not countenance the use of their facilities for any false, deceptive or misleading advertising. The rule we adopt today does not have the force of "holy writ" and it is subject to alteration should electronic media advertising become a special problem.

### B. *Routine legal services*

We decline the invitation and reject the suggestion that we attempt to define the phrase "routine legal services" that figures so prominently in *Bates.* This is a matter of relativity.

It has been said that "one man's poison is another man's meat." So with routine legal services. The procurement of patents and copyrights is "routine" to the practitioners in those fields but is wholly beyond the ken of the general practitioner. A so-called simple will or a simple deed or a simple divorce, contested or not, may present significant tax problems that are routine to some practitioners and yet beyond the ability of others.

■ Instead of permitting advertisement of "routine legal services," the rule we adopt today permits the advertisement of any legal service, restricted only by the guidelines and standards contained in various portions of the Code.

■ We invite special attention to EC 2–30 directing that a lawyer not accept employment "when he is unable to render competent service"; to EC 6–1 directing that a lawyer "accept employment only in matters in which he is or intends to become competent to handle"; and to EC 6–3 providing that a lawyer "should not accept employment in any area of the law in which he is not qualified" unless he intends to make a good faith effort to become qualified.

We hold that a lawyer may not advertise in any area in which he is not currently competent. His intent to become competent is not sufficient. His advertising must await his proficiency.

■ We recognize that this is a broad standard, but we are dealing with a new and novel idea and embark upon an uncharted course. We cannot and will not specify with precise accuracy the outer limits of lawyer advertising, but we urge caution and discretion on the part of lawyers who advertise and believe that advertising should be conducted with decorum and in a manner consistent with the standards of a learned profession.

### C. *Handbills, circulars, etc.*

■ Notwithstanding what we have said in the preceding section, the rule we adopt precludes advertising by the use of handbills, circulars, billboards, or by any other means, except the established and regularly circulated, or broadcast, media. Not only is handbill, circular and billboard advertising beneath the dignity of the profession, such advertising poses insurmountable problems in enforcement and is unnecessary to a proper enjoyment of the constitutional right of commercial speech.

### D. *Exemption of members of legislature*

We have exempted members of the legislature from the provisions of DR 2–102(B) because we think it unfair to require that its members, who serve on a part-time basis, remove their names from the firm names or from professional notices.

## VII.

### *Certification of Specialists*

■ It will be noted that the rule we have promulgated permits a lawyer to advertise "any legal service he or she proposes to render" with certain limitations. See DR 2–101(B)(2). It will be further noted that the rule bars a specification of any area of practice, or any statement of specialization, or any statement that he or she accepts clients only in a particular area, or restricts or limits his or her practice. See EC 2–8, EC 2–14.

Such statements are calculated to convey to the lay public the impression that the lawyer is a specialist and, therefore, possesses particular expertise in the advertised field. At the present time so advertising, be it ever so well intentioned, would be deceptive and misleading.

We cannot embrace those provisions of Proposal A of the American Bar Association, or any kindred plan, that would permit such advertising, until such time as we have an established procedure for the certification of specialists.

*Bates* specifically did not address the quality of legal services and, therefore, provides no guidance in that area. The matter of quality was not before the Court. We, however, are vitally concerned with lawyer competence with particular respect to lawyer advertising. When we permit a lawyer to advertise, we must insure that the public is not victimized by any form of advertising that has the effect of a holding out to the public of special or unique qualification or expertise.

The full implementation of Proposal A must await the availability of a program of specialization. When we consider the innovative idea of specialization we must be careful lest we work an undue hardship on lawyers who do not choose to advertise.

Specialization has become a fact of life in the legal profession today. The complicated demands of a complicated society have combined to make it impossible for any given lawyer to practice with requisite competence in all fields of law. More and more general practitioners have come to realize that there are some areas wherein the necessity for the services of a legal specialist has become a reality.

This has produced a form of *de facto* specialization. The time has come for the bench and bar to join forces in a realistic recognition that the wave of the future in the legal profession is specialization. This program need not, and should not, be instituted abruptly; but we would be remiss if we did not recognize the trend toward specialization.

Immediately following the release of this opinion, we will announce the appointment of a Commission on Specialization charged with the duty and responsibility of conferring with bar groups, individual lawyers and the academic community and, after doing so, reporting to this Court a beginning plan of certification.

In considering this matter and making its recommendation, the commission will be guided by these considerations:

a. Participation by lawyers will be on a wholly voluntary basis. No lawyer will be forced to participate in the plan against his will.

b. No lawyer will be denied the right to practice in any field of law, even though he or she is not certified therein.

c. Participating lawyers will pay all costs of administering the program.

d. Any plan must require that specialists who have accepted clients referred by other lawyers not take advantage of their position to enlarge the scope of their representation.

While these considerations are guidelines only, we make it clear that any program we adopt must be voluntary, self-supporting, and must not, in any way, trench upon the right of a lawyer to practice in any area in which he or she, acting in good faith, considers himself or herself to be competent.

We recognize that the rule we adopt in a new and untried area of professional activity may contain flaws. As they develop, they may be corrected. As we said in *Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn. 1976):

This Court welcomes the continuing criticisms of its Rules. They never become final, and are always subject to change. We solicit advice and suggestions from the Bench and Bar for their improvement.

The enforcement of the rule is the responsibility of the Disciplinary Board of this Court; however, it is not charged with the responsibility of advance approval of proposed advertising.

Mr. Justice Fones and Mr. Justice Brock concur in all except Section VI(A). It is their view that we should defer a decision on electronic media advertising for observation and study of the experience in other states before determining (1) whether to authorize electronic media advertising and (2) if authorized, the appropriate limiting guidelines.

The Rule of Court we adopt amending the Code of Professional Responsibility will become effective on the 15th day of April 1978.

COOPER and HARBISON, JJ., concur fully.

FONES and BROCK, JJ., concur in all except Section VI(A) relating to the electronic media.

## APPENDIX

### Amendments To Code Of Professional Responsibility

### IN THE SUPREME COURT OF TENNESSEE AT NASHVILLE

Rule 38 of this Court containing the Code of Professional Responsibility is amended as follows:

1. By striking from Canon 2: EC 2–2 through EC 2–4, EC 2–7 through EC 2–11, and EC 2–14 and substituting in lieu thereof the following:

EC 2–2 The legal profession should assist laypersons to recognize legal problems because such problems may not be self-revealing and often are not timely noticed. Therefor, lawyers should encourage and participate in educational and public relations programs concerning our legal system with particular reference to legal problems that frequently arise. Preparation of advertisements and professional articles for lay publications and participation in seminars, lectures, and civic programs should be motivated by a desire to educate the public to an awareness of legal needs and to provide information relevant to the selection of the most appropriate counsel rather than to obtain publicity for particular lawyers.

EC 2–3 Whether a lawyer acts properly in volunteering in-person advice to a layperson to seek legal services depends upon the circumstances. The giving of advice that one should take legal action could well be in fulfillment of the duty of the legal profession to assist laypersons in recognizing legal problems. The advice is proper only if motivated by a desire to protect one who does not recognize that he may have legal problems or who is ignorant of his legal rights or obligations. It is improper if motivated by a desire to obtain personal benefit, secure personal publicity, or cause legal action to be taken merely to harass or injure another. A lawyer should not initiate an in-person contact with a non-client, personally or through a representative, for the purpose of being retained to represent him for compensation.

EC 2–4 Since motivation is subjective and often difficult to judge, the motives of a lawyer who volunteers in-person advice likely to produce legal controversy may well be suspect if he receives professional employment or other benefits as a result. A lawyer who volunteers in-person advice that one should obtain the services of a lawyer generally should not himself accept employment, compensation, or other benefit in connection with that matter. However, it is not improper for a lawyer to volunteer such advice and render resulting legal services to close friends, relatives, former clients (in regard to matters germane to former employment), and regular clients.

### SELECTION OF A LAWYER

EC 2–7 Changed conditions, however, have seriously restricted the effectiveness of the traditional selection process. Often the reputations of lawyers are not sufficiently known to enable laypersons to make intelligent choices. The law has become increasingly complex and specialized. Few lawyers are willing and competent to deal with every kind of legal matter, and many laypersons have difficulty in determining the competence of lawyers to render different types of legal services. The selection of legal counsel is particularly difficult for

transients, persons moving into new areas, persons of limited education or means, and others who have little or no contact with lawyers. Lack of information about the availability of lawyers, the qualifications of particular lawyers, and the expense of legal representation leads laypersons to avoid seeking legal advice.

EC 2–8 Selection of a lawyer by a layperson should be made on an informed basis. Advice and recommendation of third parties —relatives, friends, acquaintances, business associates, or other lawyers—and disclosure of relevant information about the lawyer and his practice may be helpful. A layperson is best served if the recommendation is disinterested and informed. In order that the recommendation be disinterested, a lawyer should not seek to influence another to recommend his employment. A lawyer should not compensate another person for recommending him, for influencing a prospective client to employ him, or to encourage future recommendations. Advertisements and public communications, whether in law lists, telephone directories, newspapers, on the electronic broadcast media, or in any other permissible form should be formulated to convey only information that is necessary to make an appropriate selection. Such information includes: (1) office information, such as, name, including name of law firm and names of professional associates; addresses; telephone numbers; credit card acceptability; fluency in foreign languages; and office hours; (2) relevant biographical information; (3) description of the practice, to the extent that may be hereafter permitted by Rule of this Court. Pending the adoption of such a rule lawyers may not specify in any advertisement (1) one or more fields of law in which he or she practices; (2) any statement or indication that he or she specializes in, or accepts clients only in a particular area of practice or restricts his or her practice. Lawyers may give appropriate fee information. Self laudation should be avoided.

## SELECTION OF A LAWYER: LAWYER ADVERTISING

EC 2–9 The lack of sophistication on the part of many members of the public concerning legal services, the importance of the interests affected by the choice of a lawyer and prior experience with unrestricted lawyer advertising, require that special care be taken by lawyers to avoid misleading the public and to assure that the information set forth in any advertising is relevant to the selection of a lawyer. The lawyer must be mindful that the benefits of lawyer advertising depend upon its reliability and accuracy. Examples of information in lawyer advertising that would be deceptive include misstatements of fact, suggestions that the ingenuity or prior record of a lawyer rather than the justice of the claim are the principal factors likely to determine the result, inclusion of information irrelevant to selecting a lawyer, and representations concerning the quality of service, which cannot be measured or verified. Since lawyer advertising is calculated and not spontaneous, reasonable regulation of lawyer advertising designed to foster compliance with appropriate standards serves the public interest without impeding the flow of useful, meaningful, and relevant information to the public.

EC 2–10 A lawyer should ensure that the information contained in any advertising which the lawyer publishes, broadcasts or causes to be published or broadcast is relevant, is disseminated in an objective and understandable fashion, and would facilitate the prospective client's ability to compare the qualifications of the lawyers available to represent him. A lawyer should strive to communicate such information without undue emphasis upon style and advertising strategems which serve to hinder rather than to facilitate intelligent selection of counsel. Because technological change is a recurrent feature of communications forms, and because perceptions of what is relevant in lawyer selection may change, lawyer advertising regulations should not be cast in rigid, unchangeable terms. Machinery is therefore available to advertisers and consumers for prompt consideration of proposals to change the rules governing lawyer advertising. The determination of

any request for such change should depend upon whether the proposal is necessary in light of existing Code provisions, whether the proposal accords with standards of accuracy, reliability and truthfulness, and whether the proposal would facilitate informed selection of lawyers by potential consumers of legal services. Representatives of lawyers and consumers should be heard in addition to the applicant concerning any proposed change. Any change which is approved should be promulgated in the form of an amendment to the Code so that all lawyers practicing in the jurisdiction may avail themselves of its provisions.

EC 2–11 The name under which a lawyer conducts his or her practice may be a factor in the selection process. The use of a trade name or an assumed name could mislead laypersons concerning the identity, responsibility, and status of those practicing thereunder. Accordingly, a lawyer in private practice should practice only under a designation containing his own name, the name of a lawyer employing him, the name of one or more of the lawyers practicing in a partnership, or, if permitted by law, the name of a professional legal corporation, which should be clearly designated as such. For many years some law firms have used a firm name retaining one or more names of deceased or retired partners and such practice is not improper if the firm is a bona fide successor of a firm in which the deceased or retired person was a member, if the use of the name is authorized by law or by contract, and if the public is not misled thereby. However, the name of a partner who withdraws from a firm but continues to practice law should be omitted from the firm name in order to avoid misleading the public.

EC 2–14 In some instances a lawyer confines his practice to a particular field of law. In the absence of state controls to insure the existence of special competence, a lawyer should not be permitted to hold himself out as a specialist or as having official recognition as a specialist, other than in the fields of admiralty, trademark, and patent law where a holding out as a specialist historically has been permitted. Pending the adoption of an appropriate rule, a lawyer may not indicate in permitted advertising a limitation of his practice or a concentration in one or more particular areas or fields of law.

## CANON 2

### DISCIPLINARY RULES

2. BY striking from Canon 2: DR 2–101, DR 2–102, DR 2–103, DR 2–104 and DR 2–105 and inserting in lieu thereof the following:

DR 2–101 Publicity.

(A) A lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use or participate in the use of, any form of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim.

(B) In order to facilitate the process of informed selection of a lawyer by potential consumers of legal services, a lawyer may, subject to DR 2–103, publish in print media or broadcast through the electronic media, distributed in or covering the geographic area or areas in which the lawyer resides or maintains offices provided that the information disclosed by the lawyer in such publication complies with DR 2–101(A), and is presented in a dignified manner:

(1) Name, including name of law firm and names of professional associates; addresses and telephone numbers (by numerical designation only);

(2) Any legal service which he or she proposes to render, being guided by other provisions of this code, including EC 2–30, EC 6–1, EC 6–2 and EC 6–3, and EC 2–8, as amended by this rule;

(3) Date and place of birth;

(4) Date and place of admission to the bar of state and federal courts;

(5) Schools attended, with dates of graduation, degrees and scholastic distinctions;

(6) Public or quasi-public offices;

(7) Military service;

(8) Legal authorships;

(9) Legal teaching positions;

(10) Memberships, offices, and committee assignments, in bar associations;

(11) Membership and offices in legal fraternities and legal societies;

(12) Technical and professional licenses;

(13) Memberships in scientific, technical and professional associations and societies;

(14) Foreign language ability;

(15) Names and addresses of bank references;

(16) With their written consent, names of clients regularly represented, in approved law lists only;

(17) Prepaid or group legal services programs in which the lawyer participates;

(18) Whether credit cards are accepted, or whether other credit arrangements are available upon request;

(19) Office and telephone answering service hours;

(20) Fee or absence of fee for an initial consultation, provided time limit, if any, is included;

(21) Availability upon request of a written schedule of fees and/or an estimate of the fee to be charged for specific services;

(22) Contingent fee rates subject to DR 2–106(C), provided that the statement discloses whether percentages are computed before or after deduction of costs;

(23) Range of fees for services, provided that the statement discloses that the specific fee within the range which will be charged will vary depending upon the particular matter to be handled for each client and that the client is entitled, without obligation, to an estimate of the fee within the range likely to be charged, in print size equivalent to the largest print used in setting forth the fee information;

(24) Hourly rate, provided that the statement discloses that the total fee charged will depend upon the number of hours which must be devoted to the particular matter to be handled for each client and that the client is entitled, without obligation, to an estimate of the fee likely to be charged, in print size at least equivalent to the largest print used in setting forth the fee information;

(25) Fixed fees for specific legal services, the description of which would not be misleading or be deceptive, provided that the statement discloses that the quoted fee will be available only to clients whose matters fall into the services described and that the client is entitled, without obligation, to a specific estimate of the fee likely to be charged, in print size at least equivalent to the largest print used in setting forth the fee information.

(C) Any person desiring to expand the information authorized for disclosure in DR 2–101(B), or to provide for its dissemination through other forums may apply to The Disciplinary Board of the Tennessee Supreme Court. Any such application shall also be served upon the applicable local and Tennessee Bar Associations, which shall be heard, together with the applicant, on the issue of whether the proposal is necessary in light of the existing provisions of the Code, accords with standards of accuracy, reliability, and truthfulness, and would facilitate the process of informed selection of lawyers by potential consumers of legal services. Any expansion recommended in response to any such application shall be presented to the Supreme Court of Tennessee for final approval and consideration as an amendment to DR 2–101(B), universally applicable to all lawyers.

(D) If the advertisement is communicated to the public over radio, it shall be prerecorded, approved for broadcast by the lawyer, and a recording of the actual transmission shall be retained by the lawyer.

(E) If a lawyer advertises a fee for a service, the lawyer must render that service for no more than the fee advertised. Special rates may not be advertised nor is the use of "loss leader" type advertising permissible.

(F) If a lawyer publishes or broadcasts any fee information authorized under DR 2–101(B), the lawyer shall be bound by any representation made therein for a period of not less than 60 days after such publication or broadcast.

(G) This rule does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name:

(1) In political advertisements when his professional status is germane to the political campaign or to a political issue.

(2) In public notices when the name and profession of a lawyer are required or authorized by law or are reasonably pertinent for a purpose other than the attraction of potential clients.

(3) In routine reports and announcements of a bona fide business, civic, professional, or political organization in which he serves as a director or officer.

(4) In and on legal documents prepared by him.

(5) In and on legal textbooks, treatises, and other legal publications, and in dignified advertisements thereof.

(H) A lawyer shall not compensate or give anything of value to representatives of the press, radio, television, or other communication medium in anticipation of or in return for professional publicity in a news item.

(I) Lawyers may advertise only in established and regularly published print media and over established electronic media. Handbills, circulars, or the like shall not be used. Advertising through the broadcast media shall contain no music or lyrics and shall be accomplished solely by prepared texts read by an announcer. Television commercials shall consist solely of a slide presentation accompanied by dignified announcements. Electronic media advertising shall contain only information appropriate for the print media. Under no circumstances shall any lawyer personally appear on the broadcast media in connection with any commercial advertising, nor shall his photograph appear.

DR 2–102 Professional Notices, Letterheads, and Offices.

(A) A lawyer or law firm shall not use or participate in the use of professional cards, professional announcement cards, office signs, letterheads, or similar professional notices or devices, except that the following may be used if they are in dignified form:

(1) A professional card of a lawyer identifying him or her by name and as a lawyer, and giving his or her addresses, telephone numbers, the name of his or her law firm, and any information permitted under DR 2–105. A professional card of a law firm may also give the names of members and associates. Such cards may be used for identification.

(2) A brief professional announcement card stating new or changed associations or addresses, change of firm name, or similar matters pertaining to the professional offices of a lawyer or law firm, which may be mailed to lawyers, clients, former clients, personal friends, and relatives. It shall not state biographical data except to the extent reasonably necessary to identify the lawyer or to explain the change in his association, but it may state the immediate past position of the lawyer. It may give the names and dates of predecessor firms in a continuing line of succes-

sion. It shall not state the nature of the practice except as permitted under DR 2–105.

(3) A sign on or near the door of the office and in the building directory identifying the law office. The sign shall not state the nature of the practice, except as permitted under DR 2–105.

(4) A letterhead of a lawyer identifying him or her by name and as a lawyer, and giving his or her addresses, telephone numbers, the name of his or her law firm, associates and any information permitted under DR 2–105. A letterhead of a law firm may also give the names of members and associates, and names and dates relating to deceased and retired members. A lawyer may be designated "Of Counsel" on a letterhead if he has a continuing relationship with a lawyer or law firm, other than as a partner or associate. A lawyer or law firm may be designated as "General Counsel" or by similar professional reference on stationery of a client if he or she or the firm devotes a substantial amount of professional time in the representation of that client. The letterhead of a law firm may give the names and dates of predecessor firms in a continuing line of succession.

(B) A lawyer in private practice shall not practice under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under such name, or a firm name containing names other than those of one or more of the lawyers in the firm, except that the name of a professional corporation or professional association may contain "P.C." or "P.A." or similar symbols indicating the nature of the organization, and if otherwise lawful a firm may use as, or continue to include in, its name the name or names of one or more deceased or retired members of the firm or of a predecessor firm in a continuing line of succession. A lawyer who assumes a judicial, legislative, or public executive or administrative post or office shall not permit his name to remain in the name of a law firm or to be used in professional notices of the firm during any significant period in which he is not actively and regularly practicing law as a member of the firm, and during such period other members of the firm shall not use his name in the firm name or in professional notices of the firm. This prohibition shall not apply to members of the Tennessee General Assembly.

(C) A lawyer shall not hold himself out as having a partnership with one or more other lawyers unless they are in fact partners.

(D) A partnership shall not be formed or continued between or among lawyers licensed in different jurisdictions unless all enumerations of the members and associates of the firm on its letterhead and in other permissible listings make clear the jurisdictional limitations on those members and associates of the firm not licensed to practice in all listed jurisdictions; however, the same firm name may be used in each jurisdiction.

(E) A lawyer who is engaged both in the practice of law and another profession or business shall not so indicate on his letterhead, office sign, or professional card, nor shall he identify himself as a lawyer in any publication in connection with his other profession or business.

(F) Nothing contained herein shall prohibit a lawyer from using or permitting the use of, in connection with his name, an earned degree or title derived therefrom indicating his training in the law.

DR 2–103 Recommendation of Professional Employment.

(A) A lawyer shall not, except as authorized in DR 2–101(B), recommend employment as a private practitioner, of himself, his partner, or associate to a layperson who has not sought his advice regarding employment of a lawyer.

(B) A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2–103(D).

(C) A lawyer shall not request a person or organization to recommend or promote the use of his services or those of his partner or associate, or any other lawyer affiliated with him or his firm, as a private practitioner, except as authorized in DR 2–101, and except that:

(1) He may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association and may pay its fees incident thereto.

(2) He may cooperate with the legal service activities of any of the offices or organizations enumerated in DR 2–103(D)(1) through (4) and may perform legal services for those to whom he was recommended by it to do such work if:

(a) The person to whom the recommendation is made is a member or beneficiary of such office or organization; and

(b) The lawyer remains free to exercise his or her independent professional judgment on behalf of his client.

(D) A lawyer or his partner or associate or any other lawyer affiliated with him or his firm may be recommended, employed or paid by, or may cooperate with, one of the following offices or organizations that promote the use of his services or those of his partner or associate or any other lawyer affiliated with him or his firm if there is no interference with the exercise of independent professional judgment in behalf of his client:

(1) A legal aid office or public defender office:

(a) Operated or sponsored by a duly accredited law school.

(b) Operated or sponsored by a bona fide non-profit community organization.

(c) Operated or sponsored by a governmental agency.

(d) Operated, sponsored, or approved by a bar association.

(2) A military legal assistance office.

(3) A lawyer referral service operated, sponsored, or approved by a bar association.

(4) Any bona fide organization that recommends, furnishes or pays for legal services to its members or beneficiaries provided the following conditions are satisfied:

(a) Such organization, including any affiliate, is so organized and operated that no profit is derived by it from the rendition of legal services by lawyers, and that, if the organization is organized for profit, the legal services are not rendered by lawyers employed, directed, supervised or selected by it except in connection with matters where such organization bears ultimate liability of its member or beneficiary.

(b) Neither the lawyer, nor his partner, nor associate, nor any other lawyer affiliated with him or his firm, nor any non-lawyer, shall have initiated or promoted such organization for the primary purpose of providing financial or other benefit to such lawyer, partner, associate or affiliated lawyer.

(c) Such organization is not operated for the purpose of procuring legal work or financial benefit for any lawyer as a private practitioner outside of the legal services program of the organization.

(d) The member or beneficiary to whom the legal services are furnished, and not such organization, is recognized as the client of the lawyer in the matter.

(e) Any member or beneficiary who is entitled to have legal services furnished or paid for by the organization may, if such member or beneficiary so desires, select counsel other than that furnished, selected or approved by the organization for the particular matter involved; and the legal service plan of such organization provides appropriate relief for any member or beneficiary who asserts a claim that representation by counsel furnished, selected or approved would be unethical, improper or inadequate under the circumstances of the matter involved and the plan provides an appropriate procedure for seeking such relief.

(f) The lawyer does not know or have cause to know that such organization is in violation of applicable laws, rules of court and other legal requirements that govern its legal service operations.

(g) Such organization has filed with the appropriate disciplinary authority at least annually a report with respect to its legal service plan, if any, showing its terms, its schedule of benefits, its subscription charges, agreements with counsel, and financial results of its legal service activities or, if it has failed to do so, the lawyer does not know or have cause to know of such failure.

(E) A lawyer shall not accept employment when he knows or it is obvious that the person who seeks his services does so as a result of conduct prohibited under this Disciplinary Rule.

DR 2–104 Suggestion of Need of Legal Services.

(A) A lawyer who has given in-person unsolicited advice to a layperson that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

(1) A lawyer may accept employment by a close friend, relative, former client (if the advice is germane to the former employment), or one whom the lawyer reasonably believes to be a client.

(2) A lawyer may accept employment that results from his participation in activities designed to educate laypersons to recognize legal problems, to make intelligent selection of counsel, or to utilize available legal services if such activities are conducted or sponsored by a qualified legal assistance organization.

(3) A lawyer who is recommended, furnished or paid by a qualified legal assistance organization enumerated in DR 2–103(D)(1) through (4) may represent a member or beneficiary thereof, to the extent and under the conditions prescribed therein.

(4) Without affecting his right to accept employment, a lawyer may speak publicly or write for publication on legal topics so long as he does not emphasize his own professional experience or reputation and does not undertake to give individual advice.

(5) If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, but shall not seek, employment from those contacted for the purpose of obtaining their joinder.

DR 2–105 Limitation of Practice.

(A) A lawyer shall not hold himself out publicly as a specialist, as practicing in certain areas of law or as limiting his practice as permitted under DR 2–101(B), except as follows:

(1) A lawyer admitted to practice before the United States Patent and Trademark office may use the designation "Patents," "Patent Attorney," "Patent Lawyer," or "Registered Patent Attorney" or any combination of those terms, on his letterhead and office sign.

(2) A lawyer who publicly discloses fields of law in which the lawyer or the law firm practices or states that his practice is limited to one or more fields of

law shall do so by using designations authorized and approved by the Supreme Court of Tennessee.

(3) No lawyer shall hold himself or herself out as a specialist in a particular field of law or law practice, unless and until authorized to do so by the Supreme Court of Tennessee in accordance with such rules as may be prescribed by said Court.

Entered this the 15th day of April, 1978.